STEVEN G. KALAR
Federal Public Defender
Northern District of California
HANNI M. FAKHOURY
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone: (510) 637-3500
Facsimile: (510) 637-3507
Email:  Hanni_Fakhoury@fd.org

Attorneys for SAMAJ MOORE

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SAMAJ MOORE,<br><br>Defendant. | **Case No.:** CR 20-187-HSG<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**<br><br>**Court:** Courtroom 1, 4th Floor<br>**Hearing Date:** September 2, 2020<br>**Hearing Time:** 11:30 a.m. |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................... 1

STATEMENT OF FACTS .................................................................................................................. 1

    A.    Mr. Moore's History and Characteristics............................................................................ 1

    B.    The Nature and Circumstances of the Offense. ................................................................. 3

    C.    Court Proceedings. ............................................................................................................. 3

    D.    Mr. Moore's Future Rehabilitation Goals and Plans. ........................................................ 4

SENTENCING ARGUMENT ............................................................................................................. 4

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment............................ 5

    B.    Deterring Criminal Conduct and Protecting the Public. .................................................... 8

    C.    Providing Training, Medical Care or Other Treatment. .................................................... 9

    D.    The Guidelines Sentencing Range. .................................................................................. 10

    E.    Avoiding Unwarranted Sentencing Disparities. ............................................................... 10

CONCLUSION .................................................................................................................................. 11

# TABLE OF AUTHORITIES

## Cases

*Brown v. Plata*, 563 U.S. 493 (2011) ..................................................................................................2

*Gall v. United States*, 552 U.S. 38 (2007) ..............................................................................4, 5, 10

*Kennedy v. Louisiana*, 554 U.S. 407 (2008)...........................................................................5

*Tapia v. United States*, 564 U.S. 319 (2011)..........................................................................5, 9

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009)......................................10

*United States v. Bad Marriage*, 392 F.3d 1103 (9th Cir. 2004) ............................................9

*United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985).........................................................4

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc).............................................5

*United States v. Johnson*, 529 U.S. 53 (2000).......................................................................9

*Williams v. New York*, 337 U.S. 241 (1949)..........................................................................4

## Statutes

18 U.S.C. § 922 .........................................................................................................................3

18 U.S.C. § 3553 ........................................................................................................4, 5, 9, 10

18 U.S.C. § 3582 .......................................................................................................................9

## U.S. Sentencing Guidelines ("U.S.S.G.")

U.S.S.G. § 2K2.1 ....................................................................................................................10

U.S.S.G. § 3E1.1 ....................................................................................................................10

## News Articles

"Oakland homicide suspect may face life sentence on drug charges," *East Bay Times*, May 18, 2010, *available at* https://www.eastbaytimes.com/2010/05/18/oakland-homicide-suspect-may-face-life-sentence-on-drug-charges/ ...........................................................................................1

"Suspected West Oakland gang member slain in East Oakland," *East Bay Times*, Aug. 20, 2008, *available at* https://www.eastbaytimes.com/2008/08/20/suspected-west-oakland-gang-member-slain-in-east-oakland/..........................................................................................................2

Andrew Becker, "'Culture of death'/Pervasive violence is rendering many Oakland youth numb, some fear," *San Francisco Chronicle*, Mar. 5, 2004, *available at*

https://www.sfgate.com/bayarea/article/Culture-of-death-Pervasive-violence-is-2786520.php..2

Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html....................6

Kimberly Kindy, "An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana," *Washington Post*, Mar. 29, 2020, *available at* https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html..................................................................................7

Kristin Bender, "One ID in midnight shooting on Derby Street in Berkeley," *East Bay Times*, Sept. 18, 2008, *available at* https://www.eastbaytimes.com/2008/09/18/one-id-in-midnight-shooting-on-derby-street-in-berkeley/ ...............................................................................................1

Nate Gatrell, "Bay Area man caught with gun, mask, rope, duct tape sentenced to time served," *The Mercury News*, May 15, 2020, *available at* https://www.mercurynews.com/2020/05/15/bay-area-man-caught-with-gun-mask-rope-duct-tape-sentenced-to-time-served/.............................11

Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it ................................................................................................5

Timothy Williams *et al.*, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times*, Mar. 30, 2020, *available at* https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.................7

**Other Authorities**

Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, Jul. 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/2768249......................................................8

**INTRODUCTION**

No one would envy the life Mr. Moore has lived. While many 4 year olds are learning their letters, Mr. Moore witnessed his father shot and killed in front of him. His mother was absent. He spent his 20s in prison. Now in his 30s, he has already had spinal surgery and will likely need a cane for the rest of his life.  Such a chaotic and traumatic upbringing predictably steered him to where he is today, awaiting sentencing in a federal criminal case, with the unpredicted twist of a global pandemic to make the situation somehow worse.

Given his horrific upbringing and drug addiction, and the fact that the pandemic makes any incarceration more difficult than it would be otherwise, he asks this Court to grant a downward variance in this case and sentenced him to credit for time served (approximately 5½ months), to be followed by three years of supervised release.

**STATEMENT OF FACTS**

**A.    Mr. Moore's History and Characteristics.**

To put it simply, Mr. Moore never had a chance. He was born in Oakland in 1985.  Presentence Investigation Report ("PSR") ¶ 36.  His father, Roderick "Roger" Lane, was shot and killed in front of Mr. Moore when he was four years old. *Id.*[1] His mother was addicted to crack cocaine and not able to care for her children. PSR ¶ 37. Although she remarried, Mr. Moore was not close to his stepfather. *Id.* Mr. Moore and his siblings were separated, bouncing around from relative to relative, including his grandmother, aunt and uncle, who physically disciplined Mr. Moore. *Id.* He eventually found himself in group homes and juvenile hall. PSR ¶¶ 29, 33.

Mr. Moore lost other friends and relatives to gun violence. His best friend James Jackson was shot and killed in Oakland in 2003, when he and Mr. Moore were just 18 years old.[2] His closest

---

[1] *See* "Oakland homicide suspect may face life sentence on drug charges," *East Bay Times*, May 18, 2010 ("…Lockhart faces a life term because he is a 'three strikes' criminal whose prior offenses include a voluntary manslaughter conviction for a May 31, 1990, incident that left Roderick 'Roger' Lane dead…"), *available at* https://www.eastbaytimes.com/2010/05/18/oakland-homicide-suspect-may-face-life-sentence-on-drug-charges/; Kristin Bender, "One ID in midnight shooting on Derby Street in Berkeley," *East Bay Times*, Sept. 18, 2008 ("In May 1990, Parker's half-brother, Roderick Lane, 24, was killed in West Oakland."), *available at* https://www.eastbaytimes.com/2008/09/18/one-id-in-midnight-shooting-on-derby-street-in-berkeley/.

[2] *See* Andrew Becker, "'Culture of death'/Pervasive violence is rendering many Oakland youth numb, some fear," *San Francisco Chronicle*, Mar. 5, 2004 ("Oakland's last slaying of 2003 occurred

sibling, brother Jonathan Gonzalez, was shot and killed in 2008 at the age of 21 years.[3] Unsurprisingly, the surrounding violence was disruptive for Mr. Moore's development. He abused drugs and alcohol starting at the age of 12 to cope with the stress. PSR ¶ 49. He suffered from anxiety and depression. PSR ¶ 47. Most problematic, he emulated the gun violence he saw around him and in 2004, as an 18 year old, was convicted of assault with a firearm, landing him in California state prison for 14 years. PSR ¶ 25. It was his first and only prior felony conviction prior to this case.

Growing up in state prison was not easy. Mr. Moore was a young man, with little parental guidance in his life up until then, who had to navigate prison politics when the California's prisons were unacceptably crowded.[4] Overcrowding limited programming opportunities. Nonetheless, Mr. Moore tried the best he can. By 2017, as he was getting ready to be released, a reentry plan report prepared by prison officials noted that Mr. Moore had completed his GED in state prison, had been the Vice Chair of AA/NA meetings for two years, had tested negative for drugs for more than two years and had avoided any violent incident reports since 2014. *See* Exhibit A, Jan. 26, 2017 "Functional Evaluation for MCRP Eligibility" at 1. He participated in mental health treatment since 2013 and learned how to cope with stress without drugs. *Id.* at 2. Evaluators determined he was "a positive influence" on other inmates.

Mr. Moore was paroled from prison in 2018. PSR ¶ 25. He began participating in Oakland Unite, a city run program aimed at preventing gun violence. PSR ¶ 52.[5] His mentor, Javier Jimenez, writes that Mr. Moore "hit the ground running and was eager to get his life in order." *See* Exh. B, April 10, 2020 Email from Javier Jimenez. Mr. Moore was "very active in our peer groups that met biweekly at our office and he was very open about helping change other areas [to] come together for

---

near Baker Mortuary and employees heard the gunshots that killed James Jackson, 18…"), *available at* https://www.sfgate.com/bayarea/article/Culture-of-death-Pervasive-violence-is-2786520.php.

[3] *See* "Suspected West Oakland gang member slain in East Oakland," *East Bay Times*, Aug. 20, 2008, *available at* https://www.eastbaytimes.com/2008/08/20/suspected-west-oakland-gang-member-slain-in-east-oakland/.

[4] Litigation over California's overcrowded prisons culminated in the Supreme Court's 2011 decision affirming a lower court ruling ordering the state to reduce its prison population. *See Brown v. Plata*, 563 U.S. 493 (2011).

[5] *See generally* http://oaklandunite.org/.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*MOORE*, CR 20-187-HSG

peace," and "took on more of a leadership role in our peer groups and showed up every time with different ideas on how to move the work forward." *Id.* Oakland Unite helped steer Mr. Moore to a job with Tesla, where he painted cars. *Id.*; *see also* PSR ¶ 52.

Unfortunately, things took a turn for the worse when Mr. Moore started experiencing back pain. In the summer of 2018, he was diagnosed with spinal stenosis and underwent surgery to relieve pressure on his spinal cord. PSR ¶ 45. Upon discharge, Mr. Moore was prescribed strong medication—including opioids—to deal with recurring back pain. The increased drug use led to parole violations and a 90-day stint in jail. PSR ¶ 25. Unable to do the physically demanding work required at Tesla, he lost his job. Exh. B.

### B.   The Nature and Circumstances of the Offense.

On March 10 2020, Mr. Moore was attending a funeral in East Oakland for yet another friend slain by gun violence. The funeral was blocks away from where Mr. Moore's brother, Jonathan Gonzalez, had been killed in 2008. PSR ¶ 39. Still traumatized by that experience and under the influence of drugs, Mr. Moore felt he needed a weapon to protect himself.  PSR ¶ 51. Oakland police officers who were surveilling the funeral saw Mr. Moore standing in front of the mortuary, and saw the grip of a pistol in his waistband. PSR ¶¶ 6, 7. As Mr. Moore walked into a Popeye's restaurant, officers approached him at gunpoint, and directed him to get down on the ground, which he did. He was arrested and booked into Santa Rita jail, where he has since remained.

### C.   Court Proceedings.

Mr. Moore was originally charged in Alameda County Superior Court with being a felon in possession of ammunition.  The day before he was set to accept a plea offer for a sentence of probation and 120 days in jail, the federal government filed a complaint against him on April 21, 2020, charging him with being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). *See* Dkt. 1. The state dropped its case and Mr. Moore made his initial appearance in federal court on April 23, 2020. PSR ¶ 4. He waived his right to a preliminary hearing and indictment, permitted the government to file an information again him, and intends to enter an open guilty plea without a plea agreement. PSR ¶¶ 1, 3.

**D.       Mr. Moore's Future Rehabilitation Goals and Plans.**

Today, Mr. Moore is anxiously sitting in jail during a global pandemic. He has had many opportunities for self-reflection, telling the probation officer he "does not feel proud or happy" and is "disappointed, depressed and stressed." PSR ¶ 11. He is eager to work on his sobriety, and interested in participating in drug and mental health treatment and counseling. As Javier Jimenez writes, Mr. Moore "will definitely be reconnected to our program upon his release for ongoing support." Exh. B.

Mr. Moore will also have to deal with his continuing back pain. After seeing medical staff at Santa Rita multiple times, they finally concluded in July 2020 that Mr. Moore "needs to be released ASAP to see [the] surgeon that did surgery for further eval[uation] and treatment." *See* Exhibit C, Excerpt of Alameda County Medical Records.

| Call Date | 07-15-2020 9:13 am |
|---|---|
| Clinician Name | Peter Slabaugh |
| Requested by Patient? | No |
| Subjective | 07-15-2020 9:13 am - Slabaugh, Peter : pain in spine. I have seen pt multiple times for chronic thoracic back pain s/P multilevel posterior decompression with EXPECTED mechanical back pain. |
| Objective | 07-15-2020 9:13 am - Slabaugh, Peter : well healed midline thoracic spine surgical incision, no objective acute neuro abnormalty. |
| Assessment | 07-15-2020 9:13 am - Slabaugh, Peter : post thoracic spine surgical decompression with post op pain. |
| Plan | 07-15-2020 9:13 am - Slabaugh, Peter : symptomatic treatment here. needs to be released ASAP to see surgeon that did surgery for further eval and treatment, return ortho here PRN. |
| Education | [blank] |
| Recorded By | Slabaugh, Peter |
| Notes Regarding Note Off | [blank] |

## SENTENCING ARGUMENT

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949).  That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted).  The factors detailed in 18 U.S.C. § 3553 (a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).  The sentence recommended in the U.S.

Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

Mr. Moore respectfully asks this Court to a sentence of credit for time served (approximately 5½ months) to be followed by three years of supervised release.

**A.     Seriousness of the Offense, Respect for the Law and Just Punishment.**

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"— are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

The "real conduct and circumstances" in this case include Mr. Moore's traumatic and chaotic upbringing and lengthy struggle with drug addiction and mental illness, which played a significant role in bringing him before the Court for sentencing.

Trauma during childhood creates higher risks for negative outcomes in life, including health and life opportunities.[6] Supportive and nurturing relationships and environments for children and families are at the "heart of prevention" for children with trauma history. *Id.* Mr. Moore certainly did not have that kind of childhood. He witnessed his father's shooting death when he was just four years old. PSR ¶ 36. His mother was a drug addict who was absent from his life and did not raise him. PSR ¶ 37. The uncle who did raise him used physical discipline. PSR ¶ 38. He lost other

---

[6] *See* Rhitu Chatterjee, "CDC: Childhood Trauma is a Public Health Issue and We Can Do More to Prevent It," *National Public Radio*, Nov., 2019, https://www.npr.org/sections/health-shots/2019/11/05/776550377/cdc-childhood-trauma-is-a-public-health-issue-and-we-can-do-more-prevent-it.

friends and family members, including his closest brother, to gun violence. PSR ¶ 39. He began using marijuana at the age of 12, cocaine and ecstasy at 15 and methamphetamine at 18. PSR ¶ 49. He was just 18 years old when he entered California state prison, and spent his final teenage years and his entire 20s in custody. PSR ¶ 40.

It is thus unsurprising that Mr. Moore—and his surviving siblings for that matter—have found themselves incarcerated. *See* PSR ¶ 36, n. 1.  There can be no question that Mr. Moore's mental health conditions, caused by his traumatic past and exacerbated by drug abuse, contributed to his poor judgment in this case.  As a recent article in the *New York Times* noted,

> …in a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a prison cell, or whether they are even wired to make rational decisions.[7]

It is often repeated by prosecutors that childhood trauma is not an excuse for an adult's behavior, dismissing years of neglect inflicted upon a helpless child because a grown man has had plenty of time to decide what type of adult he should be.  However, childhood trauma does not have an expiration date.  Indeed, as one Cornell University sociologist told the *New York Times,* trauma is a major factor "that shapes addictive and criminal behavior in adulthood" and is a "huge factor within the criminal justice system."[8] As a doctor with the Centers for Disease Control elaborated, "children's adverse experiences are a public health problem" as "childhood adversity and stress can chemically change the way our brains work."[9]  Thus, Mr. Moore's childhood trauma shaped his adulthood and continues to impact him every day of his life.  While Mr. Moore accepts responsibility for the mistakes that he alone caused, any sentence must take his childhood adversity into account.

Moreover, in determining a "just punishment," the Court must also consider how Mr. Moore will serve his custodial sentence during the COVID-19 pandemic.  Even in the best of times, prisons and jails have "long been known to be associated with high transmission probabilities of infectious

---

[7] *See* Audra Burch, "A Gun to His Head as a Child. In Prison as an Adult." *New York Times*, Oct. 15, 2017, https://www.nytimes.com/2017/10/15/us/childhood-trauma-prison-addiction.html.
[8] *Id.*
[9] *Id.*



diseases."[10] Incarcerated individuals "are at special risk of infection" and "infection control is challenging."[11] Prisons and jails "contain high concentrations of people in close proximity and are breeding grounds for uncontrolled transmission [of infection]."[12] Incarcerated individuals share bathrooms, sinks, and showers. They eat together, and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living quarters. "The conditions and reality of incarceration makes prisons and jails tinderboxes for the spread of disease."[13] In short, "our jails are petri dishes."[14]

---

[10] Letter from Patricia Davidson, Dean, Johns Hopkins School of Nursing, *et al.,* to Hon. Larry Hogan, Governor of Maryland, Mar. 25, 2020, https://bioethics.jhu.edu/wp-content/uploads/2019/10/Johns-Hopkins-faculty-letter-on-COVID-19-jails-and-prisons.pdf (co-signed by over 200 faculty members of Johns Hopkins Bloomberg School of Public Heath, School of Nursing, and School of Medicine).

[11] Open Letter from Gregg S. Gonsalves, Assistant Professor, Department of Epidemiology of Microbial Diseases, Yale School of Public Health, *et al.* to Vice President Mike Pence and Other Federal, State and Local Leaders, Mar. 2, 2020, https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_covid-19_letter_from_public_health_and_legal_experts.pdf (co-signed by 814 experts in public health, law and human rights).

[12] Letter from Dr. Sandro Galea, Dean, Boston University School of Public Health, *et al.*, to President Trump, Mar. 27, 2020, https://thejusticecollaborative.com/wp-content/uploads/2020/03/Public-Health-Expert-Letter-to-Trump.pdf (co-signed by numerous public health officials from leading medical and public health institutions).

[13] Kimberly Kindy, "An Explosion of Coronavirus Cases Cripples Federal Prison in Louisiana," *Washington Post*, Mar. 29, 2020, https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html.

[14] Timothy Williams *et al.*, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times*, Mar. 30, 2020, https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html.

But this is not the best of times. The COVID-19 infection rate within prison generally, and BOP facilities specifically far outpaces the infection rate in the United States. A recent research letter in the Journal of the American Medical Association ("JAMA") found the COVID-19 case rate for prisoners of 3,251 per 100,000 prisoners was 5.5 times higher than the U.S. population case rate of 587 per 100,000.[15] Similarly, the adjusted death rate from COVID-19 for inmates was three times higher than would be expected if age and sex distributions of the U.S. and prison population were equal. COVID-19 has particularly ravaged the BOP. As of August 20, 2020, more than 11,000 inmates have tested positive for COVID-19 and 115 inmates have died from the disease.[16] Since March 2020, the BOP "modified its operations" to respond to the spread of COVID-19.[17] Inmates are confined to their cells for almost 23 hours a day and social visits and programming have been suspended.

Thus, because of COVID-19, any time Mr. Moore spends in prison will be more severe than it would be otherwise. That fact should be taken into account by imposing a variance from the Guideline range.

**B.    Deterring Criminal Conduct and Protecting the Public.**

A time served sentence will deter Mr. Moore from possessing a firearm again. Mr. Moore acknowledges and is ashamed about his lone prior felony conviction, and lengthy resulting sentence. *See* PSR ¶ 25. But the circumstances surrounding the present firearm offense are significantly different as its clear he did not use the firearm against anyone. Mr. Moore accepts he has made a mistake that requires punishment, but the close to six months he has spent in custody—under more restrictive conditions during a pandemic while his own physical health has deteriorated due to his spinal issues—has been enough to deter him from picking up a firearm again.

As for protecting the public, given the fact that BOP programming has been suspended due to the COVID-19 pandemic, the drug and mental health counseling Mr. Moore needs to live a law-

---

[15] Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," JAMA, Jul. 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/2768249.

[16] *See* https://www.bop.gov/coronavirus/.

[17] *See* BOP, COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp.

abiding life will have to come when he is out of custody and on supervised release. Thus, this Court should get Mr. Moore out of custody and under the watchful eye of the probation office sooner than later by imposing a time served sentence.

## C. Providing Training, Medical Care or Other Treatment.

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)).

Mr. Moore suffers from anxiety and depression, caused by the significant trauma he has experienced and exacerbated by drug abuse. PSR ¶¶ 47-50. He has only received sporadic mental health and substance abuse treatment, primarily in custody. PSR ¶¶ 48, 50. It is clear he will need more programming to turn his life around. But the unfortunate reality is that both Santa Rita and the BOP are limiting treatment services to prevent the spread of COVID-19. In any event, Congress has cautioned courts to recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). Indeed, the Supreme Court has explained a district court cannot increase the length of a sentence in order to provide a defendant with rehabilitative services, and a court determining the length of a prison sentence "should consider the specified rationales of punishment *except for* rehabilitation, which it should acknowledge as an unsuitable justification for a prison term." *Tapia*, 564 U.S. at 327 (emphasis in original).

Given the restrictions on programming due to the pandemic, the best treatment options for Mr. Moore must occur out of a custodial setting. That comes by getting Mr. Moore onto supervised release sooner rather than later. "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)). In addition to getting Mr. Moore treatment, placing him on supervised release sooner rather than later will also be more effective at ensuring he is not a danger to the public than a lengthy prison sentence.

Moreover, Santa Rita's medical staff has already determined that Mr. Moore needs outside specialized care to treat the chronic pain stemming from damage to his spinal cord. That too is a

reason for releasing Mr. Moore from custody immediately, enabling him to receive much needed follow up care for his excruciating back pain.

### D. The Guidelines Sentencing Range.

Mr. Moore agrees with the Guideline calculations in the PSR. The base offense level is 20 under U.S.S.G. § 2K2.1(a)(4)(A) due to Mr. Moore's prior felony assault conviction. PSR ¶ 13. Because Mr. Moore waived his right to a preliminary hearing and indictment, and intends to plead guilty, a three level downward adjustment for acceptance of responsibility applies under U.S.S.G. §§ 3E1.1(a) and (b). PSR ¶¶ 20-21. The adjusted offense level is therefore 17. PSR ¶ 22. Mr. Moore is in criminal history category III. PSR ¶ 28. The advisory Guideline range is therefore 30-37 months. PSR ¶ 57.

But this Guideline range only takes into account the aggravating factors in Mr. Moore's case. The range says nothing about Mr. Moore's chaotic upbringing, struggle with drug addiction and mental illness, or the current COVID-19 pandemic, which makes any prison sentence harder than it would have been otherwise, and places Mr. Moore at a significant risk of getting sick.

### E. Avoiding Unwarranted Sentencing Disparities.

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

A time served sentence ensures Mr. Moore is not unfairly equated with a defendant who actually possessed, brandished or discharged a firearm during a crime of violence. Such a sentence also takes into account Mr. Moore's chaotic upbringing, his drug addiction and mental health struggles. Finally, a time served sentence ensures Mr. Moore is not equated to a defendant going through the federal criminal justice system *before* the pandemic, when there was greater movement and programming opportunities in prison, and no possibility of catching a once in a century life-threatening illness while incarcerated. Other Courts in this district have immediately released defendants on firearm possession charges during the pandemic.

- *United States v. Iopu*, 16-CR-33-VC: defendant sentenced on August 20, 2020 to five years of probation (after eight months of pretrial custody) for being a felon in possession of a firearm. Advisory Guideline range was 46-57 months.
- *United States v. Davis*, 19-CR-688-WHO: defendant sentenced on May 14, 2020 to credit for time served (approximately five months) for being a felon in possession of a firearm. Advisory Guideline range was 30-37 months.[18]

## CONCLUSION

Mr. Moore respectfully requests this Court sentence him to credit for time served (approximately 5½ months), followed by three years of supervised release.

Dated:   August 26, 2020

Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender

/S
HANNI M. FAKHOURY
Assistant Federal Public Defender

---

[18] *See* Nate Gatrell, "Bay Area man caught with gun, mask, rope, duct tape sentenced to time served," *The Mercury News*, May 15, 2020, *available at* https://www.mercurynews.com/2020/05/15/bay-area-man-caught-with-gun-mask-rope-duct-tape-sentenced-to-time-served/.

DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE
*MOORE*, CR 20-187-HSG